IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


PENNY KLAWITTER,

                              Plaintiff,                     Case No. 3:13 CV 1575

        -vs-

THE TOLEDO HOSPITAL, et al.,                     <u>MEMORANDUM   OPINION</u>

                              Defendants.

KATZ, J.

Defendants Toledo Hospital, Northwest Ohio Cardiology Consultants, Inc., and ProMedica Northwest Ohio Cardiology Consultants, LLC have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(a).  (Doc. Nos. 36, 37, 38, 38-1).  Plaintiff Penny Klawitter has filed a response (Doc. No. 52), and the Defendants have filed a reply.  (Doc. No. 61).

On April 10, 2015, the Sixth Circuit issued the en banc decision of *EEOC v. Ford Motor Co.*, 782 F.3d 753 (2015).  In light of *Ford Motor*, the Court allowed the parties to supplement their prior briefing, if they wished, given this decision.  (Doc. No. 66).  Both parties chose to take the opportunity to file supplemental briefs.  (Doc. Nos. 67, 68).

The Court initially notes that Ms. Klawitter has consented to dismiss her complaint against Northwest Ohio Cardiology Consultants, Inc. and Promedica Northwest Ohio Cardiology Consultants, LLC.  (Doc. No. 52, p. 1, n. 1).  Therefore, summary judgment is granted to these Defendants.

## I.  Jurisdiction and Venue

The Court finds that it has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2).  Venue is also properly before this Court.  *See* 28 U.S.C. § 1391; N.D. Ohio R. 3.8.

## II.  Facts

Penny Klawitter has had migraine headaches since she was ten years old and has a migraine headache at least once a month.  She takes maintenance medications to prevent migraines, and prescription pain relievers to prevent regular headaches from turning into migraines.  When she has a migraine, she has pounding pain in her head, nausea, and vomiting. Her vision is sometimes distorted.  Witnesses have observed Ms. Klawitter as having an unsteady gait and slurred speech when she has a migraine.  Ms. Klawitter is unable to concentrate and is "barely able to function" when she has a migraine.  When the prescription pain medications do not work, she takes Demerol and Phenergan injections, either at home or at the emergency room. These medications put her to sleep.  Ms. Klawitter has lingering symptoms after a migraine, which she described as "a hangover effect."  She is lethargic and has "an overall-blah feeling."

Ms. Klawitter testified that if she felt a migraine coming on while she was at work, she would take her prescription pain medication, try to go on with her day, and continue to work.  She typically had trouble concentrating.  If the pain was bad enough that she started vomiting, she would go home.  Ms. Klawitter has driven when she had a migraine.  She once passed out and drove into a ditch while going home from work with a headache.

2

Ms. Klawitter applied for Family and Medical Leave Act (FMLA) leave because of her migraines.  In her applications for FMLA leave, Ms. Klawitter's physicians stated that she was "unable to perform any [job] functions" or "unable to function" when she was having a migraine.

Toledo Hospital granted all of Ms. Klawitter's requests for intermittent leave under the FMLA.  The hospital never denied any request Ms. Klawitter made for FMLA leave.  When Ms. Klawitter needed to use her intermittent leave, she simply called her supervisor and said she was taking FMLA leave.  She could take a partial day if that is all she needed.  If she came to work and did not feel well, she could, and did, go home using her FMLA time.

Ms. Klawitter, who started working for Toledo Hospital in 1975 as an EKG technician, was terminated from her employment after thirty-eight years of service.  In 1978, she began performing echocardiograms, learning the process while on the job.

The hospital had a written protocol for performing echocardiograms, and Ms. Klawitter was trained on the protocol.  The protocol requires the sonographer to take specific images of different parts of the heart in a specific order regardless of the reason for the test.  Once completed, a  preliminary report of the study is prepared and sent to a physician who then "reads" the study and prepares the final report.  The physician who reads the study is not necessarily the one who ordered the test.

In 2003, Ms. Klawitter left the hospital and went to work for Midwest Cardiovascular Consultants, a private physician practice doing business as CardioCare Consultants.  Ms. Klawitter worked full time for CardioCare, performing echocardiograms and later performing holter monitoring, event monitoring, and pacemaker transmissions.  She also assisted the nuclear medicine technician with nuclear stress tests.  Ms. Klawitter reported for years to the CardioCare

office manager.  In approximately 2009 or 2010, she began reporting to nuclear medicine technician Norm Szakovitz, who became the Office Manager for the clinical staff.

In September 2011, Toledo Hospital's cardiac testing department took over operation of the echo and nuclear laboratories located at CardioCare's office.  It was Ms. Klawitter's understanding that this was because the laboratories had to be accredited and this would put the laboratories under the hospital's accreditation.  As a result, Ms. Klawitter was once again a Toledo Hospital employee, subject to the hospital's policies.

Ms. Klawitter's new supervisor was Julie Arthur.  Ms. Arthur conducted Ms. Klawitter's orientation, covering department policies, including the hospital's protocol for echocardiograms. Ms. Arthur and Ms. Klawitter also reviewed the protocol for using a contrast agent when ventricular wall segments are poorly defined.

Toledo Hospital's cardiac testing centers are accredited.  As part of this accreditation, the hospital's records are audited.  Because of the audits, compliance with protocols are necessary.

As manager of the testing centers, Ms. Arthur periodically reviewed echocardiograms performed by employees.  Ms. Arthur stated she noticed that Ms. Klawitter was not following the hospital's protocol for her studies.  Ms. Arthur met with Ms. Klawitter in December 2011, to review the protocol.  Ms. Arthur reminded Ms. Klawitter that compliance with the protocol was important to maintain the laboratory's accreditation, and stated that compliance was a job expectation.  Ms. Klawitter understood and acknowledged that she needed to "pay attention and follow the protocol."

4

After the December meeting, Ms. Arthur had coaching sessions with Ms. Klawitter where they reviewed randomly selected echocardiograms that Ms. Klawitter had performed.  Ms. Klawitter found these sessions to be helpful.

On January 12, 2012, Ms. Arthur gave Ms. Klawitter a formal verbal reminder for failing to follow the echocardiogram protocol.  Ms. Klawitter was expected to follow the protocol "on all patients unless otherwise directed by a physician."  Ms. Klawitter understood that if she did not follow the protocol on all patients, she would be subject to further discipline.

Ms. Klawitter, however, expressed her disagreement with Ms. Arthur's assertions that she was not following protocol.  Ms. Klawitter testified that "I felt that no matter what I did, it wasn't enough or good enough. . . . That everything was picked apart."  Ms. Klawitter further stated:  "I would look at my echo and then look at somebody else's echo, and I couldn't tell the difference. But there was always something wrong with one of my echoes."

Ms. Arthur met with Ms. Klawitter again on March 28, 2012, to review additional studies. Ms. Arthur once again stressed the importance of following protocol.  Ms. Arthur stated that when she conducted her coaching sessions, there would be improvement in Ms. Klawitter's work. However, she would then randomly examine Ms. Klawitter's work again and then "see some slipping back into not following the protocol exactly."  Ms. Klawitter understood from the coaching that the quality of her studies needed to continue to improve.

On March 30, 2012, Mr. Szakovitz and another employee in the Perrysburg, Ohio office saw Ms. Klawitter sleeping at her desk.  Mr. Szakovitz woke her up, and Ms. Klawitter admitted that she had been sleeping.  Ms. Klawitter stated she had suffered a migraine headache the night before and she fell asleep as a residual effect of her medication.  Ultimately, Ms. Klawitter

received a Decision Making Leave (DML) for sleeping on the job, which placed her on probation for eighteen months.  Under the hospital's performance management policy, a DML is the "final and most serious level of formal discipline" and "requires the employee to make a total performance commitment" affirming that "all performance expectations in attendance and job expectations be met."

On April 25, 2012, Ms. Klawitter submitted an action plan stating that "in the future when I have residual effects from my migraine medication I will take intermittent FMLA."  Ms. Klawitter admitted knowing she was not supposed to be sleeping at work, and knew a DML was serious.

Ms. Arthur continued to coach Ms. Klawitter on her echocardiograms after the DML.  Ms. Arthur reviewed with Ms. Klawitter the revised policy for administration of contrast agents in June 2012.

On June 29, 2012, CardioCare physician Dr. Adil Karamali reported to Ms. Arthur that on the previous day Ms. Klawitter was unable to perform her job duties.  Ms. Arthur spoke to Ms. Klawitter who said nothing happened.  On July 3, 2012, Drs. Karamali and Daniel Cassavar wrote a letter stating that on June 28, 2012, Ms. Klawitter was unable to have a logical conversation, and could not, on several occasions during the day, find or download the appropriate echocardiogram for viewing and editing.  Even when they found the study for her, she could not timely gather the information they needed.  The doctors were of the opinion that Ms. Klawitter's behavior was "not conducive to excellent patient care and [was] open to errors that could not be tolerated in a medical practice."

Ms. Arthur consulted with Human Resources about the physicians' letter.  Colleen Alexander advised Ms. Arthur that if in the future the physicians or Ms. Arthur observed behavior that caused them concern about Ms. Klawitter's ability to perform her job, Ms. Klawitter should be sent for a fitness for duty examination.  They also discussed the process of making the referral should the event occur again.  Ms. Arthur discussed the physicians' letter with Ms. Klawitter and told her that if it happened again, she would be sent for a fitness for duty evaluation.  Ms. Klawitter was not disciplined for the incident.

Ms. Arthur left Toledo Hospital in August, 2012.  Mr. Szakovitz was Ms. Klawitter's interim supervisor until Ms. Arthur's replacement was selected.  In late October 2012, Tracy Morse took over responsibility for managing the cardiac testing centers, and became Ms. Klawitter's supervisor.  Ms. Morse continued Ms. Arthur's practice of coaching Ms. Klawitter on the protocol, and reminded Ms. Klawitter of the need to use Definity.

On December 19, 2012, Ms. Klawitter attended a cardiac conference at Toledo Hospital before reporting to the Perrysburg testing center.  Ms. Morse saw Ms. Klawitter enter the room late, and then sit down in the lap of one of the cardiothoracic surgeons.  Ms. Klawitter was described as loud and disruptive.

When Ms. Klawitter arrived at the Perrysburg office, Dr. Cassavar observed that her condition was impaired.  Dr. Cassavar contacted Mr. Szakovitz, who was working in another office, and asked Mr. Szakovitz to transport Ms. Klawitter to OccuHealth for a fit for duty evaluation.  Mr. Szakovitz called Ms. Morse and reported that Dr. Cassavar said Ms. Klawitter was slurring her words, was unsteady, was "bouncing off the walls," and was acting in a way not

7

appropriate for work.  Ms. Morse had not conducted a fit for duty referral before, so she contacted her Director, Londa Ommert, and Ms. Alexander.

Mr. Szakovitz traveled to the Perrysburg center to transport Ms. Klawitter to OccuHealth. He found Ms. Klawitter slumped in a chair in her office.  He tapped her on her shoulder and told her he needed to take her to OccuHealth for a fitness for duty examination.  Ms. Klawitter did not respond, but picked up her coat and walked out.  On her way to Mr. Szakovitz's truck, she was wobbly, and took his arm.  Mr. Szakovitz assisted Ms. Klawitter into his truck and drove her to OccuHealth.  Ms. Klawitter walked into OccuHealth unassisted, but was still wobbly.

Either Ms. Alexander or Ms. Ommert faxed to OccuHealth a form requesting a fitness for duty evaluation.  They also sent a copy of Ms. Klawitter's job description so the physician could evaluate whether she could perform her job duties.  Ms. Klawitter consented to treatment and to the release of information regarding the examination to Human Resources.  Ms. Klawitter believed she was there because Dr. Cassavar thought she was bouncing off the walls. OccuHealth's records report Ms. Klawitter thought she was there because she was late for work.

OccuHealth administered a breathalyzer, which was negative.  A urine sample was also taken and sent to an outside laboratory for analysis.  Dr. Espinoza examined Ms. Klawitter and released her, pending receipt of the urine test results.  Ms. Klawitter was on paid leave until the test results came back.

Dr. Espinoza reported the test results by telephone to Ms. Alexander on January 8, 2013, and Ms. Klawitter returned to work on January 10, 2013.  Because Dr. Espinoza stated in his medical report that Ms. Klawitter should not engage in "safety sensitive work," Ms. Alexander contacted Dr. Espinoza for an explanation of what he meant by "no safety sensitive work."  Ms.

8

Alexander testified that Dr. Espinoza stated that Ms. Klawitter should avoid scaffolding and operating commercial vehicles.

In early January 2013, Ms. Morse met with Ms. Klawitter at Drs. Karamali's and Cassavar's request regarding the quality of her studies. Ms. Klawitter was not following the protocol, and was omitting required parts of the study. They reviewed several studies, and Ms. Morse pointed out deficiencies and opportunities for improvement. Ms. Klawitter agreed to pay attention to detail and to follow the protocol.

In January 2013, Dr. Robert Grande, Medical Director of Toledo Hospital's non-invasive cardiac testing centers, read one of Ms. Klawitter's studies. Dr. Grande recommended that the study be repeated with a contrast agent, finding the study "incredibly inadequate."

Dr. Grande told Ms. Morse about the study. Ms. Morse reviewed the study and determined that Ms. Klawitter had failed to follow protocol, resulting in a non-diagnostic echocardiogram. Ms. Morse noted that poor endocardial borders necessitated the use of Definity, but Ms. Klawitter had failed to use it. Ms. Morse verified that there was an RN and physician in the office and Definity was in stock at the time of the echocardiogram. She asked Ms. Klawitter why she did not use Definity, and Ms. Klawitter said she did not think it was warranted. Ms. Klawitter stated she had no objections to using Definity.

Ms. Morse recommended that Ms. Klawitter be terminated for failing to follow protocol. Ms. Alexander and Randy Lucas presented the information to Human Resources Director Heidi Robinson. Ms. Robinson agreed that termination was appropriate and Ms. Klawitter was terminated. Ms. Klawitter understood that she was terminated because she did not follow protocol.

III.  Standard of Review

Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party asserting a genuine issue of material fact must support the argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  A court views the facts in the record and reasonable inferences which can be drawn from those facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). A court does not weigh the evidence or determine the truth of any matter in dispute.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which the party must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986) (internal quotation marks omitted).  If the moving party satisfies this burden, the nonmoving party "may not rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir. 2009) (citing Rule 56 and *Matsushita,* 475 U.S. at 586).  The party opposing the summary judgment motion must present sufficient probative evidence supporting its claim that disputes over material facts remain; evidence which is "merely colorable" or "not significantly probative" is insufficient.  *Anderson,* 477 U.S. at 248–52.

10

IV.  Discussion

Ms. Klawitter alleged that the Defendants violated her rights under the FMLA, 29 U.S.C.

§ 2601 et seq.  The Sixth Circuit

> has recognized two discrete theories of recovery under the FMLA:  (1) the
> so-called "interference" or "entitlement" theory arising from § 2615(a)(1), and (2)
> the "retaliation" or "discrimination" theory arising from § 2615(a)(2).  Although
> we have held that a claim for retaliatory discharge is cognizable under either
> theory, the requisite proofs differ.  The interference theory has its roots in the
> FMLA's creation of substantive rights, and if an employer interferes with the
> FMLA-created right to medical leave or to reinstatement following the leave, a
> violation has occurred, regardless of the intent of the employer.  The central issue
> raised by the retaliation theory, on the other hand, is whether the employer took the
> adverse action because of a prohibited reason or for a legitimate nondiscriminatory
> reason.  In contrast to the interference theory, the employer's motive is relevant
> because retaliation claims impose liability on employers that act against employees
> specifically because those employees invoked their FMLA rights.

*Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012) (internal quotation marks,

alterations, and citations omitted).

Section 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny

the exercise of or the attempt to exercise" any FMLA provision.  To establish a prima facie case of

FMLA interference, Ms. Klawitter must show that:

> (1) she was an eligible employee; (2) the defendant was an employer as defined
> under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the
> employee gave the employer notice of her intention to take leave; and (5) the
> employer denied the employee FMLA benefits to which she was entitled.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (citation omitted).

To establish a prima facie case of retaliation under the FMLA, Ms. Klawitter must show

that:  (1) she was engaged in a statutorily protected activity; (2) Defendants knew that she was

exercising her FMLA rights; (3) she suffered an adverse employment action; and (4) a causal

connection existed between the protected FMLA activity and the adverse employment action.

11

*Seeger*, 681 F.3d at 283.  "'The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity.'"  *Id.* (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).

Upon review, the Court concludes that Toledo Hospital is entitled to summary judgment on both FMLA theories.  The evidence establishes that Ms. Klawitter was an eligible employee for FMLA leave and worked for an employer defined under the statute.  She was entitled to such leave and would give her employer notice that she intended to use such leave.  Further, Ms. Klawitter was never denied the FMLA leave she requested.  Under *Donald*, the Court finds that Ms. Klawitter has not established a prima facie case of FMLA interference.

The hospital is also entitled to summary judgment regarding Ms. Klawitter's FMLA retaliation theory.  In reviewing the evidence presented, the Court finds that Toledo Hospital terminated Ms. Klawitter for the legitimate, nondiscriminatory reason of not complying with the hospital's protocol.  The record is replete with repeated instances of Ms. Klawitter's failure to follow hospital procedures, despite being given constant training on how to properly perform the procedures in question.

The record shows Ms. Klawitter was allowed to take FMLA leave for over a decade, and was in fact encouraged to do so by her supervisor.  Even Ms. Klawitter admitted in her deposition that she did not believe she was terminated because she took FMLA leave.  (Doc. No. 39, pp. 166–67).  Given Ms. Klawitter's admission, the overwhelming evidence of her failure to comply with hospital protocol, and the years which elapsed between when Ms. Klawitter started taking FMLA leave and her termination, the Court finds that Ms. Klawitter has not established a prima

12

facie case of retaliation.  *Seeger*, 681 F.3d at 282–83; *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) ("the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with 'other evidence of retaliatory conduct to establish causality'").  Therefore, Toledo Hospital is entitled to summary judgment on Ms. Klawitter's FMLA retaliation claim.

Regarding Ms. Klawitter's supplemental state law claims, 28 U.S.C. § 1367(c)(3) allows this Court to decline to exercise supplemental jurisdiction over state law claims if this Court "has dismissed all claims over which it has original jurisdiction . . . ."  Because the Court has dismissed Ms. Klawitter's federal claims, the Court declines to exercise jurisdiction over her state law claims.  *See* 28 U.S.C. § 1367(c)(3); *see also Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996).  Accordingly, Ms. Klawitter's state law claims are dismissed without prejudice.

V.  Conclusion

By consent of the parties, summary judgment is granted to Northwest Ohio Cardiology Consultants, Inc. and ProMedica Northwest Ohio Cardiology Consultants, LLC as to all issues raised in Ms. Klawitter's complaint.

Summary judgment is granted to Toledo Hospital regarding Ms. Klawitter's FMLA interference and retaliation claims.  Ms. Klawitter's supplemental state law claims as to Toledo Hospital are dismissed without prejudice.

IT IS SO ORDERED.

    s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE